

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CV-14-302

|  |  |
|---|---|
| BECKY DUNCAN and PATRICK GAITHER<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES<br><br>APPELLEE | **Opinion Delivered** September 24, 2014<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17JV-2012-184]<br><br>HONORABLE MICHAEL MEDLOCK, JUDGE<br><br>REVERSED AND REMANDED IN PART; AFFIRMED IN PART; MOTION TO WITHDRAW GRANTED |

## BILL H. WALMSLEY, Judge

Appellants Becky Duncan and Patrick Gaither appeal from the termination of their parental rights to their children. Duncan has filed a merit brief, whereas Gaither's counsel has filed a no-merit brief and a motion to withdraw, alleging that there are no meritorious grounds for his appeal. Gaither has not filed pro se points. We reverse and remand as to Duncan, but we affirm the termination of Gaither's parental rights and grant counsel's motion to withdraw.

On July 22, 2012, the Department of Human Services took emergency custody of ten-year-old A.D., four-year-old I.G., two-year-old E.G.1, eighteen-month-old E.G.2, and six-month-old D.G.[1] The Crawford County Sheriff's Office had been called to the home where

---

[1]Duncan is the mother of all of the children, and Gaither was the putative father of all of the children except A.D. A.D.'s putative father, Casey Vance, did not participate in the

the family was staying for a domestic-violence dispute, and officers subsequently contacted DHS. A.D. reported that Gaither had hit her in the neck and that Duncan had stood up for her, resulting in a fight between the couple. A.D. said that Gaither hit and strangled Duncan. A.D. and I.G. stated that their parents fought all the time. Duncan and Gaither denied any domestic violence, and Duncan claimed that finger-shaped bruises on her neck and a cut on her nose were the result of a fall. Duncan had warrants out for her arrest.

Duncan told the family service worker, Erica Eneks, that they had moved to Arkansas from Missouri about three weeks before and had only been in Crawford County about a week and a half. They did not have food stamps or WIC, but Duncan said she planned to apply. Neither parent had a job or a vehicle. There was no food in the home other than old food on the kitchen floor. Cigarette butts and dirty diapers were littered throughout the home, the mattresses in the children's room were smeared with feces and smelled of urine, and most of the children's clothes were urine-soaked.

The children were subsequently adjudicated dependent-neglected based on domestic violence, inadequate food, and environmental neglect. The goal of the case was reunification. A review order entered on April 11, 2013, noted that the parents had partially complied with the case plan by attending parenting classes, submitting to psychological evaluations, and having a home. Duncan was employed, but Gaither had not provided proof of employment and had tested positive for methamphetamine. The court stated that DHS had the discretion to increase visitation to overnights and weekends with the approval of the attorney ad litem.

_____

case and has not appealed the termination of his rights.

2

On April 19, 2013, DHS filed a motion to suspend Gaither's visitation, stating that A.D. had disclosed to the caseworker that Gaither had sexually abused her years ago.[2] DHS also claimed that I.G. had begun to exhibit sexualized behavior. After a hearing, the motion was denied, but Gaither was ordered to undergo a psychosexual evaluation. On July 9, 2013, Duncan gave birth to her sixth child, G.G. Gaither was alleged to be the father. G.G. was placed in DHS custody and he was later adjudicated dependent-neglected due to parental unfitness. In August 2013, the goal of the case was changed to adoption and termination of parental rights.

The termination hearing was held on November 14, 2013. Erica Eneks, the family's caseworker, testified that the five oldest children had been out of their parents' custody for sixteen months. Eneks said that Duncan had substantially complied with the case plan and court orders, but she had not shown enough progress. Duncan lived in a three-bedroom home in Fort Smith by herself and had rooms set up for the children. The home was clean and had enough food for her. Duncan had been employed at McDonald's for the past six or seven months and had worked at Burger King before that. Duncan had never tested positive for drugs, and she had no outstanding criminal matters. She had completed parenting classes, parenting-without-violence classes, and domestic-violence classes. The doctor who conducted Duncan's psychological evaluation had no concerns about the children being returned to Duncan.

---

[2]A sexual abuse allegation was subsequently investigated by Arkansas State Police Crimes Against Children Division and was unsubstantiated.

SLIP OPINION

At the previous hearing in August 2013, Duncan stated that she would leave Gaither "if push came to shove," and the court informed her that it had. Both parents said they were no longer in a relationship, but Eneks questioned whether they had really separated. She said that Duncan seemed to always know where to find Gaither despite him not having a phone. Eneks also believed that Gaither had helped Duncan pay her bills, but the parties denied this and Eneks agreed that she had no independent proof. Eneks wrote in the court report that she contacted the Fort Smith Water Department on October 28 and discovered that Duncan's account had been terminated and a new account had been opened in Gaither's name. Duncan said she had no intention of getting back together with Gaither and did not know where he lived.

Duncan testified that she earned $375 to $400 bi-weekly. She said that she did get behind on her bills when she was off work for about six weeks after giving birth to G.G. However, she said she had caught back up, and her last water bill was $21. Her electric bill was about $60 a month, and her rent was $400. She had lived in that home since February 2013. Duncan said that she had been receiving food stamps and had a cell phone paid for by the government. She planned on trying to get a better job. Duncan testified that the first time DHS told her she needed to obtain a vehicle was at the last staffing. She planned to get a vehicle but would use the bus until she did.

The parents had visitation with the children once a week. After their separation following the August hearing, their visitation was separate. Eneks said that Duncan attended all but one of the visitations but she had difficulty supervising all six of the children at the

4

same time. Eneks noted that Duncan had not moved past supervised visits with the children. Duncan explained that if the children were returned to her, she planned to have a babysitter care for the youngest four children while she worked and the oldest two were in school. Duncan felt that she could budget for a babysitter and said she knew of DHS programs to help her with the children that she could apply for if they were returned.

Duncan was participating in individual and family therapy with Leina Nguyen, a therapist with Ozark Guidance Center. Nguyen began seeing I.G. in March 2013 and A.D. and Duncan for family therapy in June 2013. Nguyen then recommended Duncan receive individual counseling, which began in September 2013. Duncan initially denied any abuse and minimized events that had occurred in the home. However, Nguyen said, she had become more open to discussing the issues and actively participated in their sessions. Nguyen said that they had been working on identifying safety issues and helping A.D. process the domestic violence that she witnessed and that was inflicted on her. Duncan was not named as an abuser. Nguyen said that A.D. had taken on the role of parent in order to keep the family safe. Nguyen was concerned that Duncan had suffered emotional and physical abuse by her parents and did not have support from family or others. Nguyen said there was still work to be done with Duncan.

Duncan testified that counseling had helped her communicate better and had brought her attention to things concerning her relationship with the children. She admitted that Gaither had physically abused her on a couple of occasions. Duncan testified that things the children said during therapy made her believe separating from Gaither would be better for

them.

Gaither testified that he did not have a home and had been staying with different friends. He said Duncan would not let him come near her house. He had recently begun working at Sonic and said he earned about $470 bi-weekly. He tested positive for methamphetamine and amphetamines on a hair-follicle test in October and had tested positive in April, but he claimed he had not willfully done any drugs during the case. The recommendations from a psychosexual evaluation were that he not have any unsupervised contact with children and that he complete a lie-detector test. He said he did not show up for the lie-detector test because he had to work. Gaither admitted that the children could not be returned to him, but he wanted them returned to Duncan.

Eneks did not feel confident that Duncan would be able to protect the children, maintain their safety, and provide for them financially. Eneks noted that Duncan had only recently admitted that domestic violence had been an issue, and Eneks did not believe this issue had been remedied. When they came into care none of the children's immunizations were up to date, they had not had any recent medical appointments, and they needed extensive dental work. Eneks said Duncan had not taken advantage of programs like WIC or Medicaid, so she did not believe she would take advantage of them now.

Eneks did not know when permanency could be achieved with Duncan and believed termination was in the children's best interest. She said the children were all adoptable. At the time of the termination hearing, the children were divided between three foster homes in pairs. However, most of the children had spent time in several placements, including

E.G.2, who was on her eleventh placement.

On January 8, 2014, the trial court entered an order terminating Duncan's and Gaither's parental rights. The court determined that termination was in the best interest of the children and that the following grounds for termination were proved: 1) that the five older juveniles had been had been adjudicated by the court to be dependent–neglected and had continued to be out of the custody of the parents for twelve months and, despite a meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions had not been remedied by the parents; 2) that the parents had subjected all of the juveniles to aggravated circumstances as there was little likelihood that services to the family would result in successful reunification; 3) that the five older juveniles had lived outside the home of the parents for a period of twelve months, and the parents had willfully failed to provide significant material support in accordance with the parents' means. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*); (ix)(*a*)(*3*); and (ii)(*a*).

Our standard of review in termination cases is as follows:

> Termination–of–parental–rights cases are reviewed de novo. Grounds for termination of parental rights must be proven by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. The appellate inquiry is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.

> In order to terminate parental rights, a trial court must find by clear and

7

convincing evidence that termination is in the best interest of the juvenile, taking into consideration the (1) likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Additionally, the trial court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. However, proof of only one statutory ground is sufficient to terminate parental rights.

*Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, at 9–10, 379 S.W.3d 703, 708–09 (citations omitted).

## I. *Duncan's Appeal*

Duncan challenges the failure-to-remedy ground for termination by arguing that she had remedied the issues causing removal—environmental neglect and domestic violence. The court found that she had not demonstrated that she was capable of maintaining her housing and utilities without the assistance of Gaither. Duncan had remained in the same appropriate home since February 2013. Although there was evidence that her water account had been closed for nonpayment and reopened in Gaither's name, it is unclear when this occurred and it may have happened before she decided to separate from Gaither. Duncan explained that she fell behind on her bills when she could not work for several weeks after giving birth; however, at the hearing she testified that she had caught up on her bills and had not received assistance from Gaither. Inadequate food was also an issue at the time of removal, but Duncan testified that she was now receiving food stamps.

The court also found that Duncan had not demonstrated improved parenting skills or judgment, as evidenced by her minimizing the extent of the domestic violence in the home. While Duncan did minimize the issues in the home, her therapist testified that she was

8

making progress in addressing the domestic-violence issues and that she had become more realistic about what life had been like in the home. The therapist felt that based on abuse inflicted on Duncan, it would be a long-term case. The evidence at the hearing was that the children were removed in July 2012, and Duncan started family therapy in June 2013 and individual counseling in September 2013. Such a delay in providing this critical service clearly affected the amount of progress that could be achieved prior to the termination hearing. However, when the trial court told her to separate from Gaither, she did, thereby remedying the immediate cause of the domestic violence. Duncan informed her caseworker and therapist of the separation and both she and Gaither confirmed the separation in court. There was only speculation that she had continued to have contact with Gaither or would do so in the future. We hold that termination based on this speculation is clearly erroneous.

In its finding of aggravated circumstances, the trial court found that based on the parents' lack of progress with more than fifteen months of reunification services there was little likelihood that additional services would result in successful reunification. DHS and the attorney ad litem argue that Duncan has failed to challenge the trial court's finding that she subjected the children to aggravated circumstances and that because only one ground is necessary to terminate, she has waived the issue. Duncan does note, however, the delay in receiving counseling and her progress after beginning counseling. She also argues that concerns about how she will care for the children were never addressed with referrals for childcare assistance or budgeting classes. Although the case had been open for over a year, the failure to resolve the issues that concerned DHS was due in part to DHS's delay. As

9

Duncan was in compliance with the case plan throughout the case and making progress in therapy, we hold that it was clearly erroneous to find that additional services would not result in successful reunification.

In the final ground for termination, the trial court's order stated that Duncan was ordered by the Crawford County Circuit Court in Case No. DR2012-618 to pay child support to DHS in the amount of $160 per month beginning in February 2013. The court found that as of the date of the termination hearing, she had paid a total of only $355.21. The statutory ground for willfully failing to provide significant material support defines material support as "either financial contributions or food, shelter, clothing, or other necessities when the contribution has been requested by the juvenile's custodian or ordered by a court of competent jurisdiction." Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(*c*). As Duncan argues, the record of this case contains no information about the order of child support referenced by the trial court or payments made by Duncan. At the termination hearing, Eneks simply answered "no" when asked if the parents were paying any child support to DHS. Thus, the trial court's findings are not supported by the record, and we cannot affirm termination on this ground. We reverse the termination of Duncan's parental rights and remand for reunification services to be provided.

## II. *Gaither's Appeal*

Pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(i), Gaither's attorney has filed a no-merit brief asserting that there are no issues that would support a meritorious appeal and

a motion to withdraw as counsel. The only adverse ruling was the decision to terminate Gaither's parental rights. Gaither had tested positive for methamphetamine, did not have a home, had not gone to counseling, and had not complied with the recommendations of the psychosexual assessment. We agree with counsel that there was sufficient proof that termination was in the children's best interest and that Gaither had failed to remedy the conditions that caused removal. Counsel has complied with our requirements for no-merit briefs, and there is no meritorious argument to be made for reversal; thus, we affirm the termination and grant counsel's motion to withdraw.

Reversed and remanded in part; affirmed in part; motion to withdraw granted.

PITTMAN and HIXSON, JJ., agree.

*Dusti Standridge*, for appellants.

*Tabitha Baertels McNulty*, DHS Office of Policy and Legal Services; and *Chrestman Group, PLLC*, by: *Keith Chrestman*, for appellees.