[ COUNSEL ]: That's right, Your Honor. There was a question as to the legal status of Mr. Brown under the review order filed September 21st, 2016, paragraph 9. It says based on the results of the DNA testing, D'Andre Brown shall be made a party to the case. DHS shall cause summons to be issued and served.
THE COURT : All right. The petition, which was filed later, names him as the legal father and rightly so. The Court did not specifically say I was making him legal father on September 21st, '16, but, in fact, that's what I was doing. And the resulting actions were because of that. So the record today should be clear. On September 21st, 2016, I made him the legal father, and I think we all understood that.
....
THE COURT : [Appellant], earlier, you made reference to a September 21st, 2016, order.
[ COUNSEL ]: Yes, Your Honor.
THE COURT : That was when we were talking about this legal status of Mr. Brown.
[ COUNSEL ]: Yes.
THE COURT : The Court finds that that's the day that the order was filed.
[ COUNSEL ]: Okay.
THE COURT : The hearing about which that file marked date refers, that review order, the hearing was April 29th, 2016. So it was on April 29th, 2016, that the Court changed Mr. Brown's legal-status to legal.
[ COUNSEL ]: Yes. I should have mentioned that the-
THE COURT : Okay. Thank you.
[ COUNSEL ]: -order seemed to be entered a few months-
THE COURT : Yes.
[ COUNSEL ]: -later.
*903 THE COURT : Yes.
[DHS]: I'm sorry. Can I get the date that you-from the hearing?
THE COURT : April 29th, 2016. It was a review hearing. DNA results were offered to the Court at that time. Thank you. You may proceed.
Thereafter, the hearing proceeded.
At the termination hearing, Holly Johnson testified that she was the family-service worker assigned to the case. She explained that A.G. was removed due to Greenway's drug use and an inappropriate home. Appellant had been incarcerated at that time and was released in August 2016. Johnson testified that she went to the jail on December 12, 2015-even though she thought appellant was just listed as the putative father at that time-to go over the case plan. She explained the importance of maintaining contact with DHS, submitting to drug screens, allowing DHS into the home, and having appropriate housing and employment.
After his release, appellant completed a parenting workbook and watched "The Clock Is Ticking" video. However, Johnson expressed concerns regarding appellant's home. She explained that the home had broken windows, broken glass and a knife on the floor, and broken glass outside the home in the grass. Appellant had admitted to DHS that there were no utilities at the home on May 18, 2017. On May 26, 2017, Johnson testified that she had visited the home but appellant was not there. Someone from inside the home stated that he was "watching the home." Johnson testified that although she did not go inside the home without appellant's being there, she did not observe any lights on in the home. She further testified that she thought Greenway, an untreated drug user, was still living in the home with appellant after the trial court had terminated Greenway's parental rights and severed her relationship with A.G. Additionally, Johnson testified that appellant had failed to provide any proof of income or employment during the pendency of the case. Appellant had sporadic visitation with A.G. since his release, visiting her only four times. On one of those occasions, he was asked to leave after he became very aggressive with the staff.
Therefore, Johnson opined, there would be a risk of potential harm if A.G. was returned because of her concerns with the home and appellant's ability to support A.G. Johnson further opined that A.G. was adoptable and was doing well in her placement with her maternal grandfather and step-grandmother. Johnson testified that there were not any other services that could have been provided to appellant that would have increased the likelihood that the home would have been safe for A.G. She testified that DHS could not "make him provide ... proof of employment [or] make him keep an appropriate home."
Autumn Matthews, appellant's parole and probation officer, testified that appellant is on probation and parole for offenses involving controlled substances. Appellant received permission to move to Greene County to live with his girlfriend, Kelli Greenway. During her only home visit, Matthews observed broken glass by the front door and all over the floor inside the home. She testified that the home was not clean and had a strong foul odor. Kelli Greenway was at the home during her visit and told Matthews that she lived there with appellant. At some point, appellant admitted to Matthews that there was no electricity on at the home. Matthews described appellant's demeanor as extremely aggressive if he did not get his way and testified that, to her knowledge, he did not have a steady income.
Appellant testified. Appellant denied that Greenway was living with him at the *904 time of the hearing but did admit that she was trying to get approval from her probation officer to do so. Later, on cross-examination, appellant testified that Greenway did live with him for approximately a week. Although appellant admitted that Greenway was his girlfriend, he testified that it was his intention to marry her. Appellant further testified that he was "disregarding [the] Court's [previous] finding that Kelli Greenway poses a risk and threat of harm to [A.G.]."
Appellant explained that the broken glass and trash observed by Johnson and Matthews had been cleaned up with Greenway's assistance, although his window is still broken as the result of someone breaking into his home. Appellant's landlord was supposed to fix the window. Appellant admitted that his electricity had been turned off at his home because he was unable to pay the bill; however, appellant testified that the electricity had been turned back on by the time of the termination hearing. Appellant additionally testified that he was working for his landlord doing maintenance work, earning approximately $60 per day five days a week. He stated that he felt DHS had not assisted him to achieve reunification with his child.
Earnest Friend testified that appellant had been doing maintenance work with him during the last five or six months for approximately sixty-five rental properties. Friend testified that appellant was paid ten dollars an hour and was paid by Reuben Watkins's estate for his work.
After the hearing, the trial court terminated appellant's parental rights. In the termination order, the trial court found by clear and convincing evidence that it was in A.G.'s best interest to terminate appellant's parental rights. It stated that it considered the likelihood that A.G. would be adopted and the potential harm to the health and safety of A.G. by returning her to appellant. Additionally, the trial court made the following pertinent findings:
2. The Court has considered and reviewed all the evidence submitted and the testimony of the witnesses in this matter, and finds that the Arkansas Department of Human Services has proven by clear and convincing evidence that:
a. The father has abandoned the child. A.C.A. § 9-27-341(b)(3)(B)(iv).
b. Other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the child in the custody of the father is contrary to the child's health, safety and welfare and despite the offer of appropriate family services, the father has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the father's circumstances which prevent the placement of the child in the custody of the parents. A.C.A. § 9-27-341(b)(3)(B)(vii)(a) .
c. D'Andre Brown is found by this Court to have subjected the juvenile to aggravated circumstances in that the child has been abandoned and that there is little likelihood that further services to the family will result in successful reunification. The Court finds that no additional services to the father will promote reunification.
Specifically, the Court finds that D'Andre Brown has had no meaningful contact with the child. The Court finds that D'Andre Brown has not provided proof of stable and safe housing. The Court finds that the father's house is not safe for the child because Kelli Greenway, whose parental rights regarding this child have been terminated and *905 whom D'Andre Brown intends to marry, is regularly in the home, and dangerous items, including but not limited to broken glass, are on the floor of the home. The Court finds D'Andre Brown does not have sufficient income, nor has he provided proof of stable income or employment. The Court finds that D'Andre Brown is not credible regarding: Kelli Greenway in living in the home, his income and employment, and his housing. The Court finds that the child cannot be safely placed with D'Andre Brown today. The Court finds that there is little likelihood that reunification services would result in successful reunification, and there are no services known to the Court that would result in successful reunification.
This appeal followed.
II. Standard of Review
A trial court's order terminating parental rights must be based on findings proven by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2017). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Posey v. Ark. Dep't of Health & Human Servs. , 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. Id.
In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. Reid v. Ark. Dep't of Human Servs. , 2011 Ark. 187, 380 S.W.3d 918.
III. Parental Status
Appellant first argues that the trial court erred in terminating his parental rights because he had not specifically been found to be A.G.'s biological parent before the termination hearing, citing Earls v. Arkansas Department of Human Services , 2017 Ark. 171, 518 S.W.3d 81, as support. We disagree because appellant consented to and acquiesced in the trial court's finding that his parental status had been established.
Appellant was initially identified as a putative parent and ordered to establish paternity and submit to DNA testing. In the September 21, 2016 order, the trial court treated appellant as the "legal father" after DNA testing had confirmed that he is the biological father. While appellant essentially argues that the September 21, 2016 order was not clear enough on this issue, at the commencement of the termination hearing, the trial court specifically covered this issue with the attorneys, including the attorney for the appellant.
*906 As set forth above in the quoted colloquy, appellant clearly participated in the colloquy with the trial court and thereafter, consented to or acquiesced with, the following findings, inter alia , by the trial court:
The Court did not specifically say I was making him legal father on September 21st, '16, but, in fact, that's what I was doing. And the resulting actions were because of that. So the record today should be clear. On September 21st, 2016, I made him the legal father, and I think we all understood that.
(Emphasis added.) Appellant had the opportunity to object to the trial court's finding; however, he did not. At the conclusion of the colloquy, the parties immediately began introducing evidence on the issue of termination.
Our supreme court has made it clear that "an appellant may not complain of an action of the trial court which he induced, consented to, or acquiesced." Ponder v. Ark. Dep't of Human Servs. , 2016 Ark. 261, at 5, 494 S.W.3d 426, 429 (quoting Childers v. H. Louis Payne, D.C. , 369 Ark. 201, 205, 252 S.W.3d 129, 132 (2007) ); see also R&L Carriers Shared Servs., LLC v. Markley , 2017 Ark. App. 240, 520 S.W.3d 268 ; Whitt v. Ark. Dep't of Human Servs. , 2015 Ark. App. 293, 461 S.W.3d 386 ; Gilliam v. Gilliam , 2010 Ark. App. 137, 374 S.W.3d 108. Despite appellant's contention otherwise on appeal, appellant clearly consented to or acquiesced in the trial court's finding that his parental status had been determined in the trial court's prior review order. For this reason, we hold that the trial court's decision was not clearly erroneous.
IV. Statutory Grounds
Appellant next argues that the trial court erred in terminating his parental rights because there was insufficient evidence to support the grounds asserted in the petition to terminate parental rights. We disagree.
The trial court granted the termination petition based on three grounds: (1) the abandonment ground under Arkansas Code Annotated section 9-27-341(b)(3)(B)(iv) ; (2) the subsequent-factors ground under Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a) ; and (3) the aggravated-circumstances ground under Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(a) . Arkansas Code Annotated section 9-27-341(b)(3)(B) defines these grounds as follows:
(iv) A parent has abandoned the juvenile;
....
(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.
....
(ix)(a) The parent is found by a court of competent jurisdiction, including the circuit court juvenile division, to:
....
(3)(A) Have subjected any juvenile to aggravated circumstances.
(B) "Aggravated circumstances" means:
(i) A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been *907 or is made by a judge that there is little likelihood that services to the family will result in successful reunification[.]
In this case, DHS sufficiently proved the subsequent-factors ground. A parent's failure to comply with court orders can serve as a subsequent factor upon which termination can be based. Miller v. Ark. Dep't of Human Servs. , 2017 Ark. App. 396, 525 S.W.3d 48 ; Clements v. Ark. Dep't of Human Servs. , 2013 Ark. App. 493, 2013 WL 5273040. Here, appellant was ordered by the trial court at the adjudication hearing, which he attended, to cooperate with DHS, comply with the case plan, and obey all orders; keep at least weekly contact with the caseworker, keep DHS informed of current address, and notify DHS of any changes in address, contact information, marital status or employment status; view "The Clock is Ticking" video; obtain and maintain stable housing with the utilities turned on; allow DHS access into the home; obtain and maintain stable employment or income sufficient to support the family; and remain drug free and submit to random drug screens. However, according to Johnson, appellant failed to provide any proof of his employment or income. Additionally, Johnson testified that there were concerns with the appropriateness of appellant's home and concerns with appellant's intention to marry and live with Kelli Greenway, whose parental rights had already been terminated because she posed a risk of harm to A.G. Although appellant testified at the hearing, the trial court found his self-serving testimony not credible, which is within its province to do.
Appellant lastly argues that DHS failed to provide him appropriate family services to address any subsequent issues. As the attorney ad litem correctly notes, Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a) requires DHS to only "offer ... appropriate family services." (Emphasis added.) Appellant argues that he preserved his argument regarding the services offered by DHS on appeal because he testified at the hearing that he felt that the caseworker "was not working with me whatsoever. I even went in there multiple times and asked for a different caseworker[,]" but was told that "I had [to] bring that up in front of the Judge and with the lawyer." See Martin v. Ark. Dep't of Human Servs. , 2017 Ark. 115, 515 S.W.3d 599 ; Threadgill v. Ark. Dep't of Human Servs. , 2017 Ark. App. 426, 526 S.W.3d 891.
In Jackson v. Arkansas Department of Human Services , 2013 Ark. App. 411, 429 S.W.3d 276, we reversed and remanded a trial court's termination of parental rights when DHS failed to show that it had taken any steps to (1) contact the parent after his appearance in the case, (2) determine the parent's suitability as a caregiver, or (3) provide services to him. Although appellant testified that his caseworker did not assist him in achieving reunification, Johnson testified otherwise. Johnson testified that she explained to appellant the importance of maintaining contact with DHS, submitting to drug screens, allowing DHS into the home, and having appropriate housing and employment. Furthermore, appellant completed a parenting workbook and watched "The Clock Is Ticking" video. Johnson testified that there were not any other services that could have been provided to appellant, stating that DHS could not "make him provide ... proof of employment [or] make him keep an appropriate home." Based on this evidence, we hold that the trial court did not clearly err in finding that DHS provided appropriate family services to appellant sufficient to support the subsequent-factors ground. Because only *908 one ground is necessary to terminate appellant's parental rights, it is unnecessary for us to address appellant's arguments regarding the other statutory grounds found by the trial court. Accordingly, we affirm.
Affirmed.
Abramson and Vaught, JJ., agree.