Cite as 2020 Ark. App. 443

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-20-250

| | |
|---|---|
| KELLY TROGSTAD<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** September 30, 2020<br><br>APPEAL FROM THE MILLER COUNTY CIRCUIT COURT [NO. 46JV-16-181]<br><br>HONORABLE KIRK JOHNSON, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

The Miller County Circuit Court terminated appellant Kelly Trogstad's parental rights to two of her children, S.J. (DOB: 4-11-07) and A.T. (DOB: 8-27-12). Kelly argues on appeal that the trial court erred in terminating her rights because there was insufficient evidence of grounds and because termination is not in her children's best interest. We affirm.

I. *Background*

A petition for dependency-neglect was filed by the Arkansas Department of Human Services (DHS) on September 28, 2016, with respect to S.J. Attached to the petition was the affidavit of a family-service worker who attested that on September 7, 2016, a report had been received on the child-abuse hotline that S.J. had a black eye. At the time, the family already had a differential-response case open. According to "DR Grundy," S.J. had been in and out of facilities, has anger issues, is on medication, and had recently run away.

Grundy told the family-service worker that "the children have been in foster care for the same thing in Oklahoma." Grundy also told the family-service worker that she had received a late-night phone call from S.J.'s stepfather and Kelly's husband, Jedediah Trogstad, during which she heard screaming and the words "I'm about to slap him." Grundy reportedly told Jedediah that he could not slap S.J. to which Jedediah said that no one could tell him how to punish his kids. The family-service worker later spoke with S.J. about how he had gotten a black eye, and S.J. told her that Jedediah had kicked him in the eye for "smarting off." S.J. told her about other incidents in which Jedediah had struck him. Kelly acknowledged that Jedediah had slapped S.J. because he had cursed at them. In the affidavit, the family-service worker noted that DHS has an extensive history with the family dating back to 2002 and involving an older child belonging to Kelly. Also attached to the petition was a protection plan that had been signed by Jedediah on September 23, 2016, agreeing that he would not use corporal punishment on S.J. at any time for any reason.

On December 16, 2016, S.J. was adjudicated dependent-neglected based on the trial court's finding that he was at substantial risk of harm from abuse and parental unfitness. DHS was ordered to continue to provide services to the family, and S.J. remained in his mother's custody.[1] Review orders entered in February and May 2017 indicated that Kelly was complying with the case plan and court orders. In August 2017, a review order indicated that Kelly was complying with the case plan and court orders but that she had been arrested

---

[1]The trial court ultimately terminated the parental rights of S.J.'s biological father, Samuel Jones, Sr., but he is not a party to this appeal.

2

on June 10, 2017, for possession of drug paraphernalia. Among other things, she was ordered to submit to a hair-follicle test.

On August 23, 2017, DHS filed a petition for emergency custody and dependency-neglect. The trial court issued an ex parte order for emergency custody the same day and found that Jedediah had grabbed S.J. by the head, picked him up, and thrown him across a room. The trial court noted that Kelly was present when this occurred. The trial court also found that Kelly had permitted A.T. to sit on her lap while she was driving and had admitted slapping S.J. in the car. The trial court also found that an investigator had walked through the family's home and reported that it was in disarray, was foul smelling, and contained exposed wiring. Moreover, the children's clothing was not clean and smelled of mildew. When asked about the recent incident that she witnessed between S.J. and Jedediah, Kelly said that S.J. had started it. She also said that, if the children were going to be removed from her custody, she did not want S.J. back.

On October 24, 2017, S.J. and A.T. were adjudicated dependent-neglected because of abuse and parental unfitness. The trial court found that Kelly had failed to provide a safe environment given the physical abuse inflicted on S.J. by Jedediah and that A.T. is at risk given that Kelly refused to acknowledge her husband's abuse of S.J.  Kelly was ordered to submit to a psychological evaluation; submit to a drug-and-alcohol assessment and successfully complete counseling and rehabilitation if recommended; submit to random drug screens; maintain housing and allow DHS access to the home; obtain employment; maintain regular contact with the children; and continue to cooperate with DHS.

Review orders entered in January and April 2018 indicated that Kelly was complying with the case plan and court orders. A permanency-planning order was entered in August 2018, which likewise indicated that Kelly was complying with the case plan and court orders. A fifteen-month review order entered November 29, 2018, however, indicated that Kelly had not complied with the case plan and court orders in that Kelly had failed to provide a home address to DHS and had failed to submit to random drug screens. The trial court ordered supervised visitation because of Kelly's positive drug screens.

DHS subsequently filed a petition to terminate Kelly's parental rights alleging four grounds. A hearing was eventually held on August 28 and September 4, 2019. On January 13, 2020, the trial court issued a nineteen-page, single-spaced letter opinion granting DHS's petition. On February 5, 2020, the trial court entered an order terminating Kelly's parental rights on the basis of four grounds found in Ark. Code Ann. § 9-27-341(b)(3)(B): (i)*(a)* (one-year failure to remedy); (ii)*(a)* (failure to provide significant support or maintain meaningful contact); (vii)*(a)* (subsequent factors or issues); and (ix)*(a)* (aggravated circumstances). The trial court also considered the children's best interest. It is clear that the trial court considered the likelihood of adoptability because it noted that an adoption specialist had testified that there are over 100 potential adoptive homes for the siblings. It further found that Kelly had ample time to comply with the case plan but that she seemed unwilling to remedy the situation in that she failed to address her drug issues and continued to test positive for drugs. Kelly filed a timely notice of appeal.

## II. *Standard of Review*

A trial court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9–27–341(b)(3) (Supp. 2019). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Brown v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 104, 542 S.W.3d 899. The appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a trial court must find clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B); however, only one ground must be proved to support termination. *Brown, supra.* The trial court must also find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii).

III. *Discussion*

A. Grounds for Termination

Kelly challenges all of the grounds found by the trial court. Because proof of only one ground is necessary to support termination, we will address aggravated circumstances. Section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)* & *(B)* provides that "aggravated circumstances" means a juvenile has been abandoned, chronically abused, subjected to extreme and repeated cruelty, or sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification. The trial court appears to have based its finding of aggravated circumstances on a little-likelihood determination.[2] There must be more than a mere prediction or expectation on the part of the trial court that reunification services will not result in successful reunification. *Cloninger v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 282.

Kelly argues that DHS failed to prove that there is little likelihood that services will result in successful reunification because DHS did not provide her with drug treatment. She acknowledges that a finding that DHS has made reasonable efforts to provide services is not required for a little-likelihood determination.[3] Nevertheless, Kelly asserts that the little-likelihood determination was based on her drug use over the last year of the case, during which time DHS provided no services for her to remedy the situation. She asserts that drug

---

[2]This court may utilize a trial court's oral pronouncements to determine the intent behind its written orders. *Ward v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 491. Here, the trial court's order is informed by its detailed letter opinion.

[3]*Cloninger, supra*; *Guardado v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 16, 568 S.W.3d 296; *Kohlman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595; *McLemore v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 57, 540 S.W.3d 730.

6

treatment was a "critical service" that affected her progress, as in *Duncan v. Arkansas Department of Human Services*, 2014 Ark. App. 489.

In *Duncan*, this court reversed the trial court's decision to terminate Duncan's parental rights to six children based on three grounds. This court concluded that there was a delay in providing counseling, with which Duncan had made improvements and shown progress. That critical service was in connection with the failure-to-remedy ground, which requires reasonable efforts to provide appropriate services. With respect to the aggravated-circumstances ground, however, this court concluded that because Duncan was in compliance with the case plan throughout the case and making progress in therapy, the trial court clearly erred in finding that additional services would not result in successful reunification. *Duncan*, 2014 Ark. App. 489, at 9–10.

*Duncan* is distinguishable. Duncan's children were removed from her custody in July 2012, and her parental rights were terminated in a January 2014 order following a November 2013 hearing. Duncan had not begun individual counseling until September 2013. In other words, she had only approximately three months to benefit from the counseling. Here, Kelly had over two years to regain custody of her children, and DHS did not delay providing drug-related services to Kelly.

Fairly early on in her case, Kelly submitted to a drug assessment, and intensive counseling was recommended. The trial court found that, instead of entering one of the recommended counseling programs offered by DHS, Kelly began attending a program at her local church called "RU," with which the trial court was not familiar. The trial court had some question whether Kelly's attendance at RU was an "honest effort to overcome

7

her addiction" or a way to avoid the intensive treatment that she needed. The trial court noted that it was more inclined to believe the latter. The trial court found that Kelly had not once tested negative for drugs, that she had refused to submit to drug screens by not giving DHS a physical address, and that she had evaded a drug test by clipping her nails. In fact, Kelly appeared to be under the influence of drugs at the termination hearing. The trial court told Kelly's counsel, "[Y]our client is squirming around like a worm in hot ashes, gesticulating, appears to be agitated and knocking on the table, facial contortions, and I mean it just appears she's tweaking, probably from meth." Kelly was drug tested following the hearing. The test results were abnormal in that the temperature of the sample was cold. The trial court wrote in its letter opinion that it was clear that Kelly had tried to pass off someone else's urine as her own.

It is true, as Kelly asserts, that DHS did not provide her drug treatment over the course of the last year of her case; however, notwithstanding her lack of drug treatment, there was other evidence that demonstrated there was little likelihood that services would result in successful reunification. In a psychological evaluation dated November 8, 2017, the examiner wrote that Kelly had received a general IQ score of 48, which placed her in the extremely low-average range of overall intellectual functioning. It was also noted that her responses indicated a "faking good" profile. The examiner wrote,

> She appears to lack the skills for effective parenting and childcare, and has no means to support the children. She would require live-in supervision and support, in this examiner's opinion, to rear a child, and also financial support, drug rehabilitation, education, and ongoing counseling. It appears that adoption might be an option for her younger child, and a residential treatment center for her older child. Her prognosis is poor, and reunification appears doubtful.

Also, Kelly would not leave Jedediah, who had abused S.J. in her presence. Jan Lishman, a domestic-violence coordinator at the Texarkana Police Department, testified that she had been monitoring communications between Kelly and Jedediah, who was in jail, since June 2019. She said that there was a definite pattern of Jedediah having Kelly lie, mislead, and say whatever DHS wants to hear in order to get the children back. In an email to Kelly, Jedediah instructed her to "just play the game." Lishman said that Kelly adamantly refused to ever leave Jedediah. Even at the termination hearing, Kelly expressed her confusion as to why DHS wanted her to leave Jedediah.

Finally, Kelly has an extensive history with DHS dating back to 2002 involving her other children. A family-service worker who testified at the termination hearing said that she did not know of any other services that could have been offered to Kelly that would have made a difference. Under these facts, we cannot say that the trial court clearly erred in finding that aggravated circumstances supported terminating Kelly's parental rights.

B. Best-Interest Finding

As for best interest, Kelly challenges only the adoptability prong of the analysis. This court has held that adoptability is but one factor that is considered when making a best-interest determination. *Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, 385 S.W.3d 285. Moreover, we have held that there is no requirement that every factor must be established by clear and convincing evidence; rather, after consideration of all of the factors, the evidence must be clear and convincing that termination is in the best interest of the children. *Id.*

9

Lisa Forte, an adoption specialist, submitted an affidavit in which she stated that both S.J. and A.T. are adoptable given favorable characteristics, such as their young ages and good health. She testified at the termination hearing that a data-match search revealed 169 potential adoptive families. Forte said that she was trying to get the brothers adopted together but that S.J.'s behavioral issues may cause a problem because he was currently in a facility. She admitted that it would be more difficult to get S.J. adopted. She said that if a therapist recommends that they be separated for adoption, she will change her whole plan to look for families separately.

Kelly asserts that Forte did not indicate whether her data-match search included S.J.'s specific behavioral and mental-health needs. She also states that Forte did not say whether there was a family that would adopt a sibling group with those specific needs or whether the siblings would be able to maintain contact with their older sister, K.P.

Although Kelly relies on *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227, that case is distinguishable in that the caseworker testified simply that "all children are adoptable," and there was no other evidence regarding adoptability. Here, Forte testified to these children's individual characteristics and admitted that finding an adoptive family for S.J. will be more difficult. The Juvenile Code does not require "magic words" or a "specific quantum" of evidence to support a trial court's finding regarding adoptability. *Solee v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 640, 535 S.W.3d 687. It merely requires that if an adoptability finding is made, then evidence must exist to support it. *Id.* Evidence that adoptive parents have been found is not required, and neither is evidence that proves the child will be adopted. *Id.* A case-worker's testimony that a child is

10

adoptable is sufficient to support an adoptability finding. *Id.* "Setting the bar higher would unfairly punish children with special needs or developmental disabilities who need permanency—especially if the behavior and development issues are a direct result of the parent's unfitness and inability to properly parent." *Solee*, 2017 Ark. App. 640, at 8–9, 535 S.W.3d at 692–93. Moreover, the trial court must make an individual determination whether termination is in each child's best interest and cannot treat the children as an amorphous group in which the best interest of one will meet the interests of all. *Allen-Grace v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 286, 577 S.W.3d 397.

There was sufficient evidence put forth through Forte's testimony for the trial court to have considered the likelihood that S.J. and A.T. will be adopted. In any event, "[p]arental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children." *McElroy v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 117, at 6, 432 S.W.3d 109, 113–14. We cannot say that the trial court clearly erred in finding that termination of Kelly's parental rights was in her children's best interest.

Affirmed.

GLADWIN and WHITEAKER, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.

11