Cite as 2020 Ark. App. 507

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-20-298

| | |
|---|---|
| DANIEL KEVIN BAKER AND KATHERINE BAKER<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** November 4, 2020<br><br>APPEAL FROM THE GREENE COUNTY CIRCUIT COURT [NO. 28JV-18-200]<br><br>HONORABLE BARBARA HALSEY, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

The Greene County Circuit Court terminated the parental rights of appellants, Daniel Kevin Baker (Kevin) and Katherine Baker, to three children, J.S. (DOB: 4-27-2010), M.B. (DOB: 5-6-2018), and R.B. (DOB: 4-3-2019).[1] The parents filed separate appeals. Neither parent challenges grounds supporting termination; rather, they argue that the trial court clearly erred in finding that termination is in the children's best interest. Kevin argues that the trial court erred in finding that adoption is a viable permanency plan because there was no evidence to support such finding other than a caseworker's testimony that all children are adoptable. Katherine argues that the trial court erred in failing to consider the children's

---

[1]Kevin is not J.S.'s biological father, so his rights were terminated only as to M.B. and R.B.

paternal grandparents as an alternative option for placement and custody of the children and in failing to give appropriate weight to the evidence presented on adoptability. We affirm.

## I. *Background*

On September 5, 2018, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect as to J.S. and M.B. In an affidavit attached to the petition, a family-service worker noted that DHS has a history with the family dating back to 2012 involving J.S. She further attested that on September 1, 2018, DHS had received a call from the Greene County Sheriff's Department stating that then four-month-old M.B. was found at a motel with two adults, one of whom was Kevin's stepbrother. There was a meth pipe and other drug paraphernalia present, and the woman holding M.B. was blowing smoke in his face. The adults who had been sent by Katherine to check on the baby were charged with child endangerment and possession of drug paraphernalia. M.B. was taken by DHS but later returned to Katherine. A few days later when it became apparent that the children were residing in unsafe living conditions in a temporary arrangement, and because Katherine was evasive when asked to take a drug screen, DHS took J.S. into custody, and a hold was retaken on M.B.

The trial court issued an ex parte order for emergency custody and later found probable cause to believe that emergency conditions existed. The parents were ordered to comply with standard welfare orders. On November 19, 2018, the trial court adjudicated J.S. and M.B. dependent-neglected based on the parents' stipulation. A review order was entered April 1, 2019, in which the trial court found that Katherine had partially complied with the case plan and that Kevin had not complied with the case plan.

2

A week later, DHS filed a petition for emergency custody and dependency-neglect as to R.B., who was born with drugs in his system. The same day, the trial court issued an ex parte order for emergency custody based on Kevin's arrest at the hospital, positive drug screens for both parents, the imminent arrest of Katherine on fraud charges, and having no appropriate caregiver for the infant. A probable-cause order was entered, and R.B. was later adjudicated dependent-neglected based on Garrett's Law. The trial court noted that Kevin had not contributed to the dependency-neglect of R.B. but that he was unfit for placement because his home had no working utilities and he had a prior positive drug screen.

On August 15, 2019, the trial court entered a permanency-planning order as to J.S. and M.B. and a review order as to R.B. The goal of the case was noted to be guardianship with a concurrent goal of adoption. The trial court found that the parents had not complied with the case plan and court orders. In a fifteen-month review order, the trial court changed the goal of the case to adoption only. The trial court ordered DHS to conduct a home study on the paternal grandparents, Marcia and Cleve Baker, and ordered the grandparents to submit to a nail-bed drug screen.

DHS subsequently filed a petition to terminate Katherine's parental rights to all three children and Kevin's parental rights to M.B. and R.B., alleging three grounds. Following a hearing on February 11, 2020, the trial court terminated Kevin's parental rights as to M.B. on the failure-to-remedy ground, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2019), and as to both M.B. and R.B. on two grounds: Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)* (subsequent factors) and Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)* (aggravated circumstances). The trial court terminated Katherine's parental rights to J.S. and M.B. on

the failure-to-remedy ground and as to all three children on grounds of subsequent factors and aggravated circumstances. The trial court noted that it had considered potential harm and that it had "specifically considered the likelihood that the juveniles will be adopted" and found "no bar to adoption." The parents timely appealed from the termination order.

## II. *Standard of Review*

A trial court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Brown v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 104, 542 S.W.3d 899. The appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a trial court must find clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B); however, only one ground must be proved to support termination. *Brown*, *supra*. The trial court must also find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically

4

addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii).

### III. *Termination Hearing*

Jenny Sims, the DHS family-service worker assigned to the Bakers' case, testified to the parents' lack of compliance with the case plan and their multiple positive drug screens, their instability with income and housing, their arrests during the pendency of the case, and their sporadic visits with the children and the fact that they had appeared to be under the influence during some of the visits. She said that both parents are currently incarcerated. Both Kevin and Katherine admitted that they have a drug problem and that they are not in a position to take the children home with them. They both wanted the children placed with Kevin's parents, Marcia and Cleve.

Sims testified that Marcia and Cleve had been ruled out as a potential adoptive placement. She said that the grandparents had expressed uncertainty on whether they could care for an infant. Also, Sims discovered that R.B. had been sleeping in a basinet containing a pile of blankets, socks, and clothes—an obvious suffocation hazard. Sims said that Marcia was supposed to take M.B. for his shots but that she had failed to do so. She described the upstairs at the grandparents' home as "a disaster" in that there was lumber, pieces of a broken ceiling fan, a drum set that had been torn apart, and scattered tools. She said that there was also exposed wiring and large nails protruding from the walls. Sims noted that M.B.'s baby bed had been placed in front of a large double set of windows with blinds. She further testified that Cleve had admitted smoking marijuana. Sims conceded that the children had been placed with the grandparents twice, but she said that they had been removed the

5

second time due to the concerns to which she testified. Sims stated that, despite having six months to complete foster-parent training, Marcia and Cleve had not completed it. Sims described Marcia and Cleve as "nice, kind people" but said that they enable the parents and are naïve about the parents' drug use. Sims also noted that the grandparents had permitted Kevin and Katherine to live in their vehicle in the backyard and that Cleve had said they fed Kevin and Katherine "at the back door like dogs."

Sims testified that the three children are currently in separate homes. J.S. is in a therapeutic foster home, has ADHD, and is dyslexic. He has an IEP (individualized education program) at school and sees a therapist and a psychologist. Sims described J.S. as a very sweet child and said that he had been through a lot but was on the right path to being stable. She stated that, with the right medication and continued therapy, she believed J.S. is adoptable. She conceded that J.S. has made threats at school and against adults and other children, that he tears things up, that he has had five risk assessments, and that he had tried to burn down a house. She said that he is being monitored for autism after a psychological evaluation. Sims said that, despite his behavior, she did not foresee anything stopping J.S. from being adopted by the right family. She said that he had been in seven placements and that his current placement is not interested in adopting him. Mary Murphy, a CASA (court-appointed special advocate) volunteer, said that J.S. is struggling in school with his grades. She said that it might be difficult getting J.S. adopted because of his mental-health issues. She said, "I honestly don't know that he has a high probability of being adopted."

Sims stated that M.B. and R.B. do not have any major medical issues. M.B. receives speech therapy, occupational therapy, and physical therapy. R.B. is delayed and receives

physical and occupational therapies. She testified that both M.B. and R.B. are adoptable. Murphy testified that M.B. and R.B. have a high probability of being adopted. Sims said that the children's current placements, however, have not expressed any interest in adopting them.

IV. *Discussion*

A. Kevin Baker

Kevin argues that the trial court erred in its best-interest finding because there was insufficient evidence demonstrating the likelihood of adoption as a permanency plan. Kevin argues that the trial court must demonstrate that it considered the evidence presented in regard to the children's adoptability, or the court has to find that the children's adoptability makes no legal difference. He contends that although adoptability is not an essential element, there is precedent for reversal of this case because it was clear that the caseworker's position was that "all children are adoptable," citing *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227. Kevin concedes that Sims testified in detail about the children's characteristics, but he maintains that those characteristics actually served to undermine her opinion regarding adoptability. Kevin argues that the trial court simply stated that it considered adoptability but did not give an analysis and did not find that adoptability made no legal difference.

This court has held that adoptability is but one factor that is considered when making a best-interest determination. *Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, 385 S.W.3d 285. Moreover, we have held that there is no requirement that every factor must be established by clear and convincing evidence; rather, after consideration of all of the

factors, the evidence must be clear and convincing that termination is in the best interest of the children. *Id.* The termination statute does not mandate that the trial court make a specific finding that the children are adoptable, nor must the court find the children are "likely" to be adopted. *Hensley v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 78, 595 S.W.3d 68. The statute mandates only the "consideration" of the likelihood of adoptability. *Id.*

Although Kevin relies on *Grant*, *supra*, that case is distinguishable in that the caseworker in *Grant* testified simply that "all children are adoptable," and there was *no other evidence* regarding adoptability. Here, Sims and Murphy testified to these children's individual characteristics and stated that M.B. and R.B. are adoptable or have a high probability of being adopted.[2] A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Solee v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 640, 535 S.W.3d 687. There is no requirement that an adoption specialist testify at the termination hearing or that the process of permanent placement be completed at the time of the termination hearing. *Hensley*, *supra*. The Juvenile Code does not require "magic words" or a "specific quantum" of evidence to support a trial court's finding regarding adoptability. *Solee*, 2017 Ark. App. 640, at 9, 535 S.W.3d at 693. It merely requires that if an adoptability finding is made, then evidence must exist to support it. *Id.* Evidence that adoptive parents have been found is not required, and neither is evidence that proves the child will be adopted. *Id.*

---

[2]Although Sims and Murphy admitted that finding an adoptive family for J.S. will be more difficult, J.S. is not Kevin's biological child to which any parental rights attached.

There was evidence from which the trial court could consider the likelihood that M.B. and R.B. will be adopted, and the trial court specifically considered this factor. The trial court was not required to provide any analysis beyond its consideration of adoptability. We are not left with a firm conviction that the trial court made a mistake in finding that termination of Kevin's parental rights was in the best interest of M.B. and R.B.

## B.  Katherine Baker

Katherine argues that the trial court erred in not considering placement of the children with Marcia and Cleve and asserts that the trial court would not allow "adequate testimony" regarding placement with the paternal grandparents as an alternative to termination of her parental rights. Katherine cites *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102, and *Lively v. Arkansas Department of Human Services*, 2015 Ark. App. 131, 456 S.W.3d 383, for the proposition that this court recognizes the potential harm in terminating a parent's rights to his or her child as it relates to and affects the relationship with other members of that parent's family and that the trial court must consider less drastic alternatives to termination. She points out that Marcia and Cleve are ready and willing to accept all three children for placement in their home. She contends that they cooperated fully with the home study and that their nail-bed drug screens were negative.[3]

In both *Caldwell* and *Lively*, we reversed the termination of each father's parental rights because the children were in the custody of their mothers; thus, termination would

---

[3]Katherine asserts in her brief that the home study on the paternal grandparents was completed on January 30, 2020. The study does not appear in the record or in Katherine's addendum. The nail-bed drug screens appear in the record but were not included in Katherine's addendum.

not achieve permanency. Moreover, we noted that severance of each father's parental rights would also sever the children's relationship to their paternal grandparents. *Caldwell* and *Lively* are inapplicable because the children in both cases were in the custody of a parent. Here, the children are in foster care with little hope of ever reuniting with Katherine in a reasonable amount of time viewed from the children's perspective. Moreover, Sims testified that the paternal grandparents' home had been ruled out as a possible placement because of safety concerns.

Katherine also cites *Prows v. Arkansas Department of Human Services*, 102 Ark. App. 205, 283 S.W.3d 637 (2008), in which this court reversed the trial court's termination of parental rights because the court had stated that the Juvenile Code dictated that if Prows could not take the child that day, termination had to occur and that Prows's recent stability could not play a role in its termination decision. Katherine likewise argues that, even though she could not take her children home that day, termination of her parental rights was not required. Here, the trial court made no such erroneous statements of law as the trial court did in *Prows*. Moreover, Katherine had admittedly shown no signs of stability or improvement.

Katherine next argues that, although the trial court's order indicated that it had considered the likelihood of adoption, the trial court provided no facts upon which it relied. She contends that there was little evidence to support the adoptability finding because the children's therapists and foster parents did not testify. Katherine asserts that the trial court's finding regarding adoptability was "just an empty and speculative conclusion." She further maintains that the foster-care system has not served her children well.

Katherine is asking this court to reweigh the evidence, which we will not do. *Davis v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 406, 587 S.W.3d 577. The trial court is not required to make specific factual findings regarding adoptability, and testimony from these children's therapists and foster parents was not required for the trial court to consider the likelihood of adoptability, especially where there was testimony from Sims and Murphy on the subject. They both testified that M.B. and R.B. would likely be adopted but that it might be harder to find an adoptive home for J.S. because of his behavioral problems. Sims did state that J.S. was doing very well in his current therapeutic foster home and was on the right path to stability. This was sufficient evidence from which the trial court could consider the likelihood of adoptability. "Setting the bar higher would unfairly punish children with special needs or developmental disabilities who need permanency—especially if the behavior and development issues are a direct result of the parent's unfitness and inability to properly parent." *Solee*, 2017 Ark. App. 640, at 8–9, 535 S.W.3d 687, 692–93. In any event, "[p]arental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children." *McElroy v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 117, at 6, 432 S.W.3d 109, 113–14. We cannot say that the trial court clearly erred in determining that termination of Katherine's parental rights as to all three children was in their best interest.

Affirmed.

GLADWIN and WHITEAKER, JJ., agree.

11

*Leah Lanford*, Arkansas Commission for Parent Counsel, for separate appellant Daniel Baker.

*Harris Law Firm*, by: *Maegan Wren*, for separate appellant Katherine Baker.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.