Cite as 2021 Ark. App. 488

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-21-333

| | |
|---|---|
| BETHANY WILLIAMS | **Opinion Delivered** December 8, 2021 |
| APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04JV-19-640] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE THOMAS SMITH, JUDGE |
| APPELLEES | AFFIRMED |

## N. MARK KLAPPENBACH, Judge

Bethany Williams appeals the termination of her parental rights to her four children, CW1, AW, LW, and CW2. Williams argues that there is insufficient evidence that termination is in the children's best interest. We affirm the circuit court's order.

Williams and her children lived with her boyfriend, Richard Goad, Jr.; his children, TG and KG; and his father, Richard Goad, Sr. The Arkansas Department of Human Services (DHS) took custody of the children in September 2019 after nine-year-old AW disclosed sexual abuse by Goad Sr. TG, age 17, and KG, age 10, told investigators that they had told Williams and Goad Jr. about the abuse of AW, but Williams and Goad Jr. did not believe them and paddled them for lying. TG and KG also revealed that Goad Sr. had sexually abused them, too. The children further disclosed that they had witnessed domestic violence in the home and marijuana use. Williams's children were subsequently adjudicated

dependent-neglected due to her neglect and parental unfitness based on her failure to protect AW when she knew or should have known that AW was being sexually abused by another adult in the home. The court also cited the drugs and firearms found in the home as a basis for adjudication.

Williams was arrested in November 2019 and charged with two felonies—permitting the abuse of a minor and possession of a controlled substance with the intent to deliver. A no-contact order between her and the children was in place pursuant to the criminal case. In June 2020, the goal of the case was changed to adoption, and DHS filed a petition to terminate Williams's rights on several grounds.[1] Williams was released from jail in September 2020 and requested a continuance of the termination hearing to give her time to comply with the case plan. The final hearing was eventually held in March 2021.

Detective Michael Braswell of the Benton County Sheriff's Office testified about his interview with Williams. Initially, Williams claimed that she never would have suspected Goad Sr. of sexual abuse. However, Williams subsequently told Braswell that there was an allegation that Goad Sr. had raped TG two years prior when the family lived in Missouri. Relatives of Goad Jr. told Williams that they had heard Goad Sr. and TG having sex. Williams said that she called 911 and an investigation was conducted, but there was no proof anything had happened. Braswell testified that he learned that TG did not disclose abuse in that investigation. In her testimony, Williams described TG as "very developmentally delayed."

---

[1]DHS also sought to terminate the parental rights of Larry Weaver, the father of the three youngest children. Weaver had initially participated in the case, but he last had contact with DHS in early 2020. His rights were terminated, and he did not appeal.

Williams also described to Braswell an incident two to three weeks earlier in which Williams sneaked into Goad Sr.'s bedroom and witnessed Goad Sr. and KG "spooning." Williams said that Goad Sr.'s crotch was pressed up against KG's buttocks, and he was rubbing her stomach. Williams told Goad Jr., who confronted his father. Williams said that Goad Jr.'s solution to the issue was making a rule that the children were not allowed in Goad Sr.'s room anymore, but Williams admitted that she did not think they would be able to enforce this rule. After the incident with KG, Goad Sr. continued to live in the home, and Williams acknowledged to Braswell that Goad Sr. had watched the children. Williams also told Braswell that she had witnessed some inappropriate sexual behavior between the children and that Goad Sr. had taken some inappropriate pictures of her without her knowledge.

Braswell testified that Williams did not seem surprised to learn of the abuse in the home. He was particularly concerned about Williams's ability to protect KG because Williams blamed KG for everything. Braswell said that, in addition to Williams's interview and the children's disclosures, his interview with Goad Jr. was an important part of the case against Williams. In a probable-cause affidavit, Braswell wrote that Goad Jr. admitted Williams had told him she thought Goad Sr. was touching the children, but Goad Jr. did not believe her. Goad Jr. eventually admitted that two of the children had told him about Goad Sr. doing inappropriate things to them. In September 2020, Williams pled guilty to both permitting the abuse of a minor and the drug charge in exchange for a sentence of six years' probation. She was required to register as a sex offender. Goad Sr. pled guilty to three counts of rape; one count of sexually grooming a child; one count of engaging children

3

in sexually explicit conduct; and one count of distributing, possessing, or viewing matter depicting sexually explicit conduct involving a child. He was sentenced to 106 years' imprisonment. Goad Jr. had pending charges of permitting the abuse of a minor and for the rape of LW. Braswell said that there was also a pending investigation regarding Goad Jr. and CW2.

Each of the children's therapists testified. CW1's therapist, Ryan Smith, testified that CW1 was working on processing past stressors and learning more appropriate ways to interact with his peers. CW1 attended four therapy sessions with Williams, but the sessions were stopped after CW1 had an increase in inappropriate behaviors at his foster home. AW was diagnosed with posttraumatic stress disorder and was still in the beginning stages of therapy with her latest therapist, Angela Shinn. She had made only minimal progress thus far, and Shinn testified that until AW has begun to process her trauma, it would not be beneficial for her to be placed with Williams or attend therapy with Williams. Shinn also wanted to know that Williams could meet AW's needs before reestablishing contact between them. Shinn testified that AW feared that Goad Sr. would be able to find her if she lived with her mother. Shinn had met with Williams one time and was left with concerns that she had not fully accepted responsibility for protecting the children. The therapist for LW and CW2, Sarah Runnels, testified that, in addition to both children having a stress-related disorder, LW had been diagnosed with nightmare disorder, and CW2 has ADHD. Runnels said that both had made progress, and both needed consistency in their lives.

4

Mykaelia Williams, the family's caseworker, testified that Williams had worked the case plan prior to and after her incarceration and had participated in all the offered services. She was employed at Sonic, but she had not obtained stable housing and she was currently living in a motel. If the children were returned to Williams, Mykaelia was concerned about whether the children would be protected, their safety plans would be followed, and their therapy needs would be met.[2] Mykaelia said that two of the children had stated concerns that another man would come into their mother's life and harm them. The children had also expressed concerns about having lights and food in the home. Williams denied to Mykaelia that she was in a new relationship, but she talked with her therapist about a relationship.

Mykaelia did not believe the children's therapies or safety plans were impediments to adoption. AW's safety plan included always being supervised when with other children. The safety plan for LW and CW2 also provided for heightened supervision, including baby gates with bells on their rooms. DHS wanted the children to be adopted as a sibling group and planned to do sibling therapy. Mykaelia said that the therapists wanted the children to finish their trauma therapy before doing sibling therapy. Mykaelia acknowledged that AW has significant behavioral problems and was in therapeutic foster care. She said that the three boys' behavioral problems were under control and had improved within the last two to three weeks. The children were originally in foster care together at a shelter and had

---

[2]In addition to mental-health therapy, both LW and CW2 received physical, occupational, and speech therapy. CW1 also received speech therapy.

5

been placed together on another occasion before circumstances required that they be moved. LW and CW2 had been placed together for the entirety of the case.

Williams testified that she had been living at a motel since November 2020 and had been unable to save enough money for a deposit for housing. She was told by her caseworker that DHS did not have a lot of resources to help with housing considering her criminal situation. Williams noted that she had completed a drug assessment, had tested negative since being released from jail, had completed parenting classes, and was participating in counseling. She said that her four counseling sessions with CW1 went great and she wanted to do more family counseling, but it had not been allowed.

Williams said that it is her fault that the children have serious issues. When asked by the court what behavior was the basis of the permitting–abuse charge that she pled guilty to, Williams said that she had been too focused on her job instead of her children. Williams said that she did not see any signs that the children were being abused and that she thought her children would tell her of any abuse. She said that she did not recall telling Braswell that she left the children alone with Goad Sr. following the incident with KG. She said that she had previously tried to get Goad Jr. to kick Goad Sr. out of the house, but he refused. Williams said that she and the children could not leave because she had nowhere to go, although she had a job and transportation. Williams testified that she has a male friend but is not in a relationship.

The circuit court found that several grounds for termination had been proved and that termination was in the children's best interest considering the likelihood of adoption and the potential harm if returned to Williams's custody. The court commended Williams

for completing much of the case plan, remaining drug-free since her release from jail, and maintaining a job. However, the court found the crux of the case to be the criminal charges to which Williams pled guilty. The court found that she had ignored several warning signs for sexual abuse, including the allegation that Goad Sr. had raped TG in Missouri, finding Goad Sr. in bed with KG, knowing that Goad Sr. had taken sexual photographs of her (Williams), and witnessing concerning sexual behavior between the children. The circuit court did not believe Williams's claim that her only failure had been being too focused on her job. The court further found that Williams lacked housing for the children and that even the children had expressed concerns about her ability to protect them and provide for their basic needs.

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2021). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Baker v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 507. The appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). The circuit court must also find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii).

Williams argues that the children's behavioral problems and the fact that each child would need to continue to comply with their safety plan is contrary to the caseworker's testimony that the children had no impediments to adoption. She argues that DHS failed to introduce any evidence of how each child's specific behavioral challenges would be overcome to find an adoptive home. She further argues that there was no testimony on the likelihood that all four children would be adopted together and points to the fact that DHS had not been able to keep the children placed together in the same foster home as proof that they would not be able to find the same adoptive home. She also claims that the lack of sibling therapy and visitation is an impediment to their adoption as a group. Williams argues that if she were given more time, given assistance with finding housing, and allowed to participate in family therapy, the children were likely to be reunified as a sibling group with her.

This court has held that adoptability is but one factor that is considered when making a best-interest determination. *Baker, supra.* Moreover, we have held that there is no

requirement that every factor must be established by clear and convincing evidence; rather, after consideration of all the factors, the evidence must be clear and convincing that termination is in the best interest of the children. *Id.* The termination statute does not mandate that the circuit court make a specific finding that the children are adoptable, nor must the court find that the children are "likely" to be adopted. *Hensley v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 78, 595 S.W.3d 68. The statute mandates only the "consideration" of the likelihood of adoptability. *Id.* Evidence that adoptive parents have been found is not required and neither is evidence that proves the child will be adopted. *Id.* A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Id.*

Williams argues that this case is like *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227, where the adoption specialist opined that all children are adoptable, and we held that the child's autism diagnosis was not considered in determining whether he was adoptable. Here, however, the caseworker, the children's therapists, and the CASA report provided evidence regarding the children's behavioral issues, safety plans, foster-care placements, and progress. The court clearly considered these factors in its findings regarding adoptability: the court acknowledged in its oral ruling that the children "do have issues." Nonetheless, the court agreed with the caseworker that the children are adoptable.

Furthermore, as argued by DHS, the Juvenile Code does not require certainty that siblings be adoptable as a group. *Corley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 397, 556 S.W.3d 538. The requirement is merely that evidence be presented and that the circuit

court consider that evidence. *Solee v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 640, 535 S.W.3d 687. Requiring proof that children will be adopted would unfairly punish children with special needs or developmental disabilities who need permanency—especially if the behavioral and developmental issues are a direct result of the parent's unfitness and inability to properly parent. *Id.* We hold that sufficient evidence was presented regarding the likelihood that the children would be adopted, and the circuit court appropriately considered this evidence in finding that termination was in their best interest. Accordingly, we affirm the circuit court's termination order.

Affirmed.

GRUBER and BROWN, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.