Cite as 2022 Ark. App. 62

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV–21–384

| | |
|---|---|
| JOHN CULLUM<br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILD<br>APPELLEES | **OPINION DELIVERED** FEBRUARY 9, 2022<br><br>APPEAL FROM THE VAN BUREN<br>COUNTY CIRCUIT COURT<br>[NO. 71JV-19-22]<br><br>HONORABLE SUSAN WEAVER,<br>JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

On May 24, 2021, the Van Buren County Circuit Court terminated appellant John Cullum's parental rights to S.C. On appeal, Cullum argues that the circuit court abused its discretion by denying his request for a different attorney and that DHS failed to prove termination was in S.C.'s best interest. We affirm.

## I. *Procedural History*

On July 8, 2019, the Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect alleging that S.C., born March 3, 2008, was at substantial risk of serious harm as a result of abandonment, abuse, neglect, and/or parental unfitness. The attached affidavit states that Cullum is S.C.'s father and custodial legal parent and that Devin

Cullum Black, S.C.'s mother, has visitation rights.[1] On July 5, Cullum was arrested for assaulting S.C., and it was alleged that Cullum had picked up S.C. by his neck and held him against the wall. S.C. suffered a cut under his tongue. As a result of Cullum's arrest and the unknown location of S.C.'s mother, DHS placed a seventy-two-hour hold on S.C. An amended ex parte order awarding DHS emergency custody was filed July 9.

Cullum stipulated that probable cause existed based on the allegations in the petition, and an order was filed on July 23. Cullum was granted supervised visitation for two hours a week, and S.C. was placed in provisional relative foster care with Cullum's sister.

On August 7, an adjudication hearing was held. The circuit court found by a preponderance of the evidence that S.C. is dependent-neglected on the basis of "the court's acceptance of the father's stipulation to a finding of dependency-neglect; cuts, bruises, welts; the father has been charged with domestic battery and aggravated assault due to the injuries to the juvenile and is presently incarcerated." S.C. remained in DHS custody, and Cullum was ordered to cooperate with DHS; keep DHS informed of his residence and employment status; participate in individual and family counseling as recommended; take medications as prescribed; refrain from using illegal drugs and alcohol; submit to random drug screens; demonstrate improved, appropriate parenting skills; obtain and maintain stable housing and employment or income; maintain a clean, safe home; demonstrate the ability to protect S.C.; comply with all court orders and terms of the the case plan; attend and complete anger-management classes; submit to psychological and drug-and-alcohol assessments; and

---

[1]Devin Cullum Black's parental rights were also terminated by the order on appeal, but she did not appeal the order, and this opinion does not address the circuit court's findings in relation to her when possible.

pay $25 a week in child support beginning August 15, 2019. Cullum was not allowed visitation due to the no-contact order in the criminal case, but supervised visitation would be allowed if the no-contact order was lifted or amended.

A review hearing was held on October 17, and the goal of the case was reunification. The court found that Cullum had housing and transportation but had failed to produce useable drug screens or attend his psychological examination. The order states,

> John Cullum has not made substantial measurable progress.
>
> The Court does not find the testimony of John Cullum credible, in that he is worried about finances of going inpatient but claims to own a mountain and houses. Furthermore, Mr. Cullum explained his tardiness for court in that he had unloaded firewood. The court does not find that credible.

In addition to prior orders, Cullum was ordered to resolve any outstanding legal or criminal issues, to complete a hair-follicle test within forty-eight hours, and to complete his psychological evaluation within fourteen days.

At the review hearing on December 4, the court added the concurrent goal of adoption. Cullum had not complied with the case plan and court orders in that he continued to use illegal drugs and had tested positive for methamphetamine before the court hearing. He had not completed his psychological evaluation and had not followed up with any treatment after he completed his drug-and-alcohol assessment. He had not made himself available for random drug screens or home visits and had missed two counseling appointments. The no-contact order that prohibited contact with S.C. remained in place. The court added that Cullum should attend NA/AA meetings and resolve any outstanding legal issues. DHS was ordered to arrange for Cullum to attend an inpatient drug-treatment program.

3

The court's order from the April 30, 2020 review hearing states that Cullum testified from the Van Buren County Jail and that he had attended a thirty-day drug-treatment program. The court found that Cullum "realizes" the program was not enough to treat his drug addiction and that Cullum would finish the program and "then will know how the criminal case will proceed." The court found that Cullum had made minimal compliance and that he needed to complete his psychological evaluation. The concurrent goals of reunification and adoption remained.

A permanency-planning hearing was held on July 2, and the court ordered that the goal of the case should be reunification "because John Cullum has made progress in that he is in a drug-treatment program." The court set a concurrent plan of adoption and ordered that S.C. remain in DHS custody because the parents were unfit. Cullum had complied with the case plan and court orders in that he had recently been in rehab and had completed a psychological evaluation. "He still needs to resolve his criminal charges and have the no-contact order lifted. Furthermore, he needs to remain drug free."

At a fifteen-month-review hearing held on September 14, the court found that S.C. needed DHS services and that he should remain in DHS custody because the "parents are unfit," and S.C.'s health and safety could not be protected if returned to them. Cullum's no-contact order remained in effect. The goal of the case was changed to adoption with reunification services to continue. The court found that Cullum had not complied with the case plan and court orders in that he had only recently obtained housing and employment, and he had not resolved the criminal charges.

4

## II. *DHS Petition and Hearing*

DHS filed a petition for termination of parental rights (TPR) on November 20. DHS alleged six statutory grounds that applied to Cullum. *See* Ark. Code Ann. § 9-27-341(b)(3)(A) and (B) (Supp. 2021). DHS alleged "the facts related to adoptability includ[e] [that] he is a nice young man. [He] does have some health issues related to his circumstances."

On February 3, 2021, a hearing on the TPR petition was held. Before any testimony, the following colloquy occurred:

| | |
|---|---|
| DEFENSE COUNSEL: | And also[, my client] has asked me to request—he has made a request to have other counsel appointed to him. And that is the first that I'm hearing of that particular request. |
| . . . . | |
| THE COURT: | All right. So we're going to go back on 71JV-19-22. I know that [defense counsel] earlier had said something about Mr. Cullum's—and may not—a request for a new counsel. Can you— |
| DEFENSE COUNSEL: | That's correct. |
| THE COURT: | Can you tell us more about that, [defense counsel]? |
| DEFENSE COUNSEL: | I would have to leave that to Mr. Cullum to explain. He just informed me— |
| MR. CULLUM: | I'm requesting for me to get a new lawyer. I just—I don't see [my counsel] being able to handle the rest of my case properly. |
| THE COURT: | Okay, why? |
| MR. CULLUM: | I just—I don't feel like he's doing everything in his power that he could be. I—I mean, you know, it—I had to ask him twice just to get my counselor to be |

5

subpoenaed into court, you know. But I just feel like if I had different counsel, I believe that the case will turn out different, you know. I mean, we—we got a new lawyer for Devin. She's coming in with all kinds of new rules and policies, you know. I—and I just—I really feel like that a different counsel will do me a lot of good.

THE COURT: [Defense counsel]?

DEFENSE COUNSEL: Your Honor, I'm happy to withdraw as Mr. Cullum's counsel if he does not feel that I am capable of representing his interests in this case. It won't be any skin off my back to do that. But however the Court wants to proceed—I mean, if Mr. Cullum is saying he's firing me as his attorney, I've got things I could do this afternoon. But I think he has to be—

THE COURT: I don't think he has the choice of firing you—

DEFENSE COUNSEL: --entitled to be—

THE COURT: --because you—

DEFENSE COUNSEL: --appointed another attorney immediately. And that would probably cause a delay in these cases being heard.

THE COURT: Right. And I don't think he can fire you. You are a court-appointed attorney. If he had hired you, that would be a different situation. [Defense counsel], do you feel that you're doing the best of your ability with what you have?

DEFENSE COUNSEL: I think I have worked with everything that Mr. Cullum has given me to work with, and that his counselor is here. Mr. McCuin is here to testify on his behalf, whether it took two or three or ten times to get him here—or for Mr. Cullum to as that, we—he is here.

And I'm not sure—[Devin's counsel] had arguments to make that don't apply to my client because those are arguments of nature of service and due process. And Mr. Cullum has been here for the entire case. He's been served properly. And I think it would be very hard to argue that he didn't have notice and that there was any

6

sort of due process argument to be made for his side of the case.

So, that said, you know, clearly, he and I don't see this case the same way, the outcome of this case, I think his expectations are, at this point, unreasonable about what he thinks will happen. So, I can—

MR. CULLUM: I haven't had contact visits with my youngest son, A.K., in over a year.[2] And I'm appointed by the Court to have contact visits with him. The reason DHS says I can't is because he's got RSV, and COVID-19. Well, we've got DHS workers going up there and seeing him. And I've got a picture of May Ann Conley not wearing a mask around my youngest son. RSV is a virus—or a bacteria disease, whatever you want to call it that lasts two weeks. So, after two weeks, he's cured, and he's good to go. Well, why can't, after that two weeks, I have contact visits with my youngest son? That makes no sense, whatsoever.

THE COURT: Okay—

MR. CULLUM: I should be able to have contact visits with my youngest son even—even in the COVID-19. And I'm sure there's other parents that are getting contact visits through COVID-19. I have not been able to touch my son, hug him, or kiss him in over a year. And I don't— I don't feel that that's fair. And I've said something to [my counsel] several times in the last—since I've been out of jail for the last seven months, about me getting contact visits, and nothing, nothing at all. And it's been brought up in court. Nothing gets done. And I just—I feel like a more aggressive lawyer would get more things done.

THE COURT: Sadly, Mr. Cullum, there are certain lawyers that people will pay an unreasonable amount of money to because they are aggressive. And, unfortunately for the parties, being aggressive doesn't always mean they're being effective; and, actually, oftentimes has the reverse effect.

[2]A.K. is the subject of a separate dependency-neglect case in the Searcy County Circuit Court.

7

[Defense counsel] is not an attorney that puts on a show. He does his job, he does it well. And just because he's not doing it the way that you feel he should do it, when he's the trained professional in this field, does not mean that he is not doing the best that he can do with what he has to work with. Just because he doesn't do everything the way you want him to do it, doesn't mean that he's not trying his best with what he can do. Because he's not being rude or obnoxious or pushy or being a bully does not mean that he's not aggressive. [Defense counsel]—I would use [defense counsel]. Like, that's how much confidence I have in him. And, believe me, I see a lot of attorneys. And there's a lot of attorneys I wouldn't say that about.

I'm going to deny your request. We're here, it's time to go. If you wanted to hire an attorney, you've had ample time to do so.

Thereafter, Cullum testified that he is S.C.'s father and that he has more than one pending criminal charge—aggravated assault due to the incident with S.C. and battery due to a jail fight. He was not aware of a bench warrant for his failure to appear. He said that the incident with S.C. happened when he was trying to discipline S.C. S.C. had run from him, and he was trying to grab him. He denied pinning S.C. against the wall by his throat. He said that the no-contact order had been in place since the incident, which occurred in 2019, and he has not had any visitation with S.C. since then. He had completed parenting classes and a drug-treatment program at Wilbur D. Mills; thereafter, he tested positive for marijuana. He said that he had completed everything except "adequate housing" and that he had money to accomplish that and was looking for a place. He left one psychological evaluation before it was completed because he thought he could leave to get something to eat during the meeting, and the rules had changed. He has completed a psychological

8

evaluation since then.  He has completed a drug-and-alcohol assessment and has been to rehab.  He went to Gyst House as a condition of his bond, but he did not complete the program because "they" wanted him to lie to DHS about his ability to get a job. He said that he had attended an anger-management class in the past.  He works for a construction company and has had the job for four months.  On cross-examination, he denied choking S.C. and said that he had accidently caused S.C. harm.

Fairfield Bay Police Officer Lye Fultz testified that on July 5, 2019, he was sent to a domestic disturbance, and when he arrived, Cullum was not there.  Cullum's girlfriend, Lillian Loosey, appeared distraught, and he saw red marks on S.C.'s neck and a little bit of blood in his mouth. Cullum returned to the scene and appeared calm.  When Cullum was placed under arrest, he became argumentative and denied that the altercation had happened.

Ms. Loosey testified that she witnessed Cullum pick up S.C. by his throat because S.C. had not cleaned his room or done the dishes.  S.C.'s mouth was bleeding.  Cullum had S.C. by his throat on the floor.  Cullum threw an Xbox at S.C., but it did not hit him. Cullum also threw a side table at S.C. and missed.

Mary Ann Conley testified that she is the DHS family service worker assigned to S.C.'s case.  She prepared the case plan and court report.  Cullum was offered services including case management, counseling, a drug-and-alcohol assessment, a psychological evaluation, parenting classes, inpatient treatment, random home visits, and random drug screening.  He completed everything except the program at Gyst House.  She said that Cullum had not benefited from services and had minimal compliance with his case plan. She said that S.C. will be thirteen years old next month and is adoptable.  "There are some

9

things that he needs to work through that we are helping him with, but we are on the road to helping him." She believes S.C. needs permanency. She said that Cullum had paid $1200 in total child support and that he does not have an appropriate home for S.C. She is fearful that S.C. would be subject to physical abuse if returned to Cullum. She said that S.C. has been in a facility receiving therapy services since August 2020. In the beginning of the case, S.C. had been placed with his aunt, but she has health problems and could not continue. He had two other foster placements before going into the facility where he is now. She had not run any data matches on S.C., and there were no background checks on relatives for placement.

Dena Dunlap, the CASA volunteer, testified that she was assigned the case in November 2019. She had met Cullum a few times and talked with him. She said that during her testimony in July 2020, Cullum texted her that she was lying and that he wanted to be put back on the stand. He later left her a voice message that she took as a threat. The voicemail was played for the court, and it states, "Hey, this is John. My ex-wife, Devin, is going to talk to me, we need to let you know. And just—we'll get together when we get time." Dunlap said that S.C. is a delightful twelve-year-old and that he is smart and kind. She said that S.C. wants a permanent place and someone to love him and make him feel safe and secure. He has a hard time trusting anyone, has a lot of anger problems, and is behind in his schoolwork but is working hard to catch up. He is working on his anger issues in group and individual therapy and has come a long way, especially in the last couple of months. She said that S.C. is absolutely adoptable and that she thinks that being returned

to Cullum would put S.C. at risk because of Cullum's anger issues. She testified that adoption and some permanency would be in S.C.'s best interest.

Dan McCuin testified that he is Cullum's counselor and that he began working with Cullum in 2019, but he was discharged after a couple of sessions when Cullum went into a drug-treatment facility and became incarcerated. Cullum came back for treatment in October 2020 and has been seeing McCuin steadily since then. He works with Cullum on conflict resolution, anger management, and substance abuse. Cullum's anger and stress levels are less apparent when he is not using drugs. He said that Cullum has made excellent progress and that when he came back into treatment, he had a completely different attitude of humility. He said that Cullum's drug tests indicate he is not using, and Cullum is more engaged in treatment, more pleasant and responsive.

When he was re-called, Cullum testified about his counseling, employment, and pending criminal cases. He asked that his rights not be terminated so that he could get the no-contact order lifted, and he asked that S.C. not be placed in a mental facility but with a family member. He admitted that the termination hearing was the first time he had mentioned any relatives for placement because "that's a question that's never been asked before, so I never got a chance to say it in court."

Lois Black testified that she is S.C.'s maternal grandmother and that she lives in Missouri. She had contact with DHS early in the case, and DHS had asked if she wanted placement of S.C. She received paperwork about Cullum's criminal charges six months ago, but she did not receive the ICPC paperwork. She called DHS many times to get an update but never received any. She was told that S.C. was in foster care and later told that

11

he was in a facility. She said that she is interested in having S.C. placed with her and that she would adopt if necessary for him to have a happy family and home life. She last had contact with S.C. in 2018. She said that she would love to have visits with him. She has a two-bedroom home that needs new flooring, and she could take S.C. within thirty days. On cross-examination, she said that she had asked someone at DHS for a visit with S.C. so she could understand his demeanor and whether he wanted to be with her. She said that she would be willing to keep her daughter away from S.C. if the judge ordered it, but she thought all parents should have a chance to redeem themselves. She said that she would allow her daughter to live with her and S.C.

Mary Ann Conley was re-called and testified that she got employer information and a check stub from Cullum. After she called to verify his employment, Cullum texted her and asked why she called his boss and whether she was trying to make him look bad. This concerned her, and she said that it was not her intention to make him look bad.

On May 24, 2021, the court's TPR order was filed. The court found that DHS had proved the grounds as alleged by clear and convincing evidence. Further, the court found that it was in S.C.'s best interest to terminate parental rights:

> In making this finding, the court specifically considered (A) the likelihood that the juvenile will be adopted if the termination petition is granted, specifically the testimony of Mary Conley and Dena Dunlap, stated that [S.C.] is currently in a mental health facility but that with time to address the trauma he has been through, there are no known barriers to a successful adoption, and [S.C.] is a loving child who is a joy to be around.

Cullum filed a timely notice of appeal, and this appeal followed.

12

III.  *Standard of Review and Applicable Law*

TPR cases are reviewed de novo.  *Jones v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 446, 636 S.W.3d 811.  An order terminating parental rights must be based on a finding by clear and convincing evidence that the sought-after termination is in the children's best interest. *Id.* The circuit court must consider the likelihood that the children will be adopted if the parent's rights are terminated and the potential harm that could be caused if the children are returned to a parent. *Rocha v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 454, 637 S.W.3d 299. The circuit court must also find that one of the grounds stated in the termination statute is satisfied. *Id.*

Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. *Fisher v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 39, 569 S.W.3d 886. When the burden of proving a disputed fact is by clear and convincing evidence, we ask whether the circuit court's finding on the disputed fact is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. *Id.*

> Adoptability is not an essential element of proof in a termination case. *McDaniel v. Ark. Dep't of Hum. Servs.*, 2013 Ark. App. 263. In other words, the identification of would-be adoptive parents is not a prerequisite to terminating a biological parent's rights. *Baker v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 507. All the law requires is that the circuit court consider the likelihood that the child will be adopted when making its best-interest determination. *Sharks v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 435, 502 S.W.3d 569.

*Jones*, 2021 Ark. App. 446, at 5, 636 S.W.3d at 815. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Miller v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 239, at 8, 492 S.W.3d 113, 118.

## IV. *Request to Change Counsel*

Cullum argues that the circuit court committed reversible error when it denied his request for new counsel without performing any balancing test and stated that he did not have the right to fire his appointed counsel. He contends that this issue raises a legal question and that the circuit court's denial should be reviewed de novo and given no deference on appeal. *See, e.g.*, *Helena-West Helena Sch. Dist. v. Fluker*, 371 Ark. 574, 268 S.W.3d 879 (2007). He asserts that his request was, in practical effect, a request for a continuance. He argues that when the circuit court denied his request to continue the matter for a new attorney to be appointed without performing a balancing test, the circuit court abused its discretion.

Cullum contends that there is an exception in TPR cases to the general rule that the constitutional protections afforded by the Sixth Amendment are not typically extended in an ordinary civil case. *See Jones v. Ark. Dep't of Hum. Servs.*, 361 Ark. 164, 205 S.W.3d 778 (2005) (holding that the right to counsel in TPR cases includes the right to effective counsel). He argues that the exception should also apply when a parent in a TPR case seeks to obtain new counsel because the Sixth Amendment also grants the right to counsel of the defendant's choosing. *Arroyo v. State*, 2013 Ark. 244, 428 S.W.3d 464. He contends that the Arkansas Supreme Court declared that the determination of whether the circuit court committed reversible error is based on whether the defendant's motion to substitute counsel

14

was wrongly denied, not whether the defendant was prejudiced by the denial. *Id.* (differentiating between counsel of choice and an ineffective-assistance-of-counsel claim). He claims that the same standard should apply here and that the question is whether the circuit court wrongly denied his motion for new counsel without regard for prejudice.

Cullum then argues that it is true that this right to choose counsel is not absolute and that the circuit court maintains broad discretion to grant or deny a continuance for the purposes of obtaining new counsel. *Id.* He argues that the circuit court must balance his right to counsel of his choice against the needs of fairness and the demands of its calendar. *Id.* He argues that the circuit court denied his request for a continuance to have a new attorney appointed without performing a balancing test; thus, he claims, the circuit court abused its discretion.

Cullum argued to the circuit court that he wanted new counsel because he wanted an aggressive attorney. Cullum did not raise his constitutional or "balancing test" arguments before the circuit court; thus, the arguments are not preserved for appeal. *Langston v. Ark. Dep't of Hum. Servs.*, 2019 Ark. 152, 574 S.W.3d 138 (holding that even when constitutional issues are presented in a TPR hearing, these objections will be waived unless made in a timely fashion to the circuit court); *Taylor v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 227 (holding appellant's argument that her constitutional rights had been violated when her request for new counsel at the TPR hearing was denied was not preserved because it was not raised in the circuit court).

V. *Best Interest*

Cullum contends that DHS failed to prove that TPR was in S.C.'s best interest. He argues that the evidence demonstrates that S.C. had to be moved from two foster homes for violent behavior toward his foster parents. He claims that the only evidence of adoptability was testimony from a caseworker, which he maintains "glossed over" S.C.'s significant behavioral issues and should not be found to support the adoptability prong "or that there was an appropriate permanency plan for the child." He emphasizes the caseworker's testimony that after six months of treatment at a facility, S.C.'s aggression was only "getting a little better." He asserts that there was no testimony offered from an adoption specialist and that no matching lists were introduced. He points to the testimony that S.C. was not adoptable on the day of the TPR hearing and that there were some hurdles to get to that point. Cullum contends that, considering the lack of evidence that S.C.'s specific characteristics were properly considered in the adoptability analysis and the fact that the system is flooded with children twelve years old and up, it is unreasonable to conclude that the evidence met the level of proof required as it relates to the likelihood that S.C. would be adopted and that termination was ultimately in S.C.'s best interest.

DHS contends that the circuit court's adoptability findings were not clearly erroneous. We agree. The best-interest determination includes consideration of the evidence supporting the specific grounds for termination. *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). The best-interest standard also includes consideration of the following two factors: (1) the child's likelihood of adoption; and (2)

the potential for harm from returning the children to the parents' custody. Ark. Code Ann. § 9-27-341(b)(3). These are not exclusive factors.

The record is clear that the circuit court considered evidence regarding S.C.'s adoptability before making its decision that TPR was in his best interest. Further, appellate courts will not reweigh the credibility of the evidence on adoptability. *Blasingame v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 71, 542 S.W.3d 873. The circuit court specifically relied on Ms. Conley's and Ms. Dunlap's testimony about S.C.'s likelihood of adoption. The circuit court noted that "with time to address the trauma" S.C. had suffered, there were "no known barriers to a successful adoption." The circuit court considered the evidence on S.C.'s adoptability, and there is no requirement that DHS disprove all possible barriers to adoption—such as behavioral issues—by clear and convincing evidence. *Solee v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 640, 535 S.W.3d 687.

Affirmed.

VIRDEN and WHITEAKER, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.